# Cynthia Haddad *vs.* Wal-Mart Stores, Inc. (No. 1).

Berkshire. February 5, 2009. - October 5, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Anti-Discrimination Law,* Employment, Sex, Termination of employment, Damages. *Employment,* Discrimination, Termination. *Damages,* Under anti-discrimination law, Punitive, Remittitur, Future earning capacity. *Evidence,* Relevancy and materiality. *Practice, Civil,* Argument by counsel, Instructions to jury.

At the trial of a civil complaint alleging unequal compensation and termination of employment based on gender, the evidence was sufficient to permit the jury to find that the defendant employer had acted with a discriminatory animus in terminating the plaintiff's employment as a pharmacy manager (i.e., that the defendant's stated reasons for the plaintiff's termination were false and that similarly situated male pharmacists were treated differently than the plaintiff for similar infractions of the defendant's policies), that the plaintiff's base pay was significantly less per hour than all the male pharmacy managers in the region, and that despite the plaintiff's repeated requests for the additional hourly pay and a bonus that the male pharmacy managers received, the defendant denied the plaintiff the bonus until just before her termination. [97-101]

At the trial of a civil complaint alleging unequal compensation and termination of employment based on gender, the award to the plaintiff employee of nineteen years' front pay was neither excessive nor speculative, where the judge properly instructed the jury as to the relevant principles to consider; where the plaintiff testified to her difficulty in obtaining a new position; where expert testimony established, based on evidence presented at trial, the plaintiff's loss of income due to the defendant's discrimination, discounted to present value; and where the award was consistent with the plaintiff's anticipated retirement age. [102-106]

In a civil action alleging unequal compensation and termination of employment based on gender, the judge erred in granting the defendant employer's motion for judgment notwithstanding the verdict on the jury's award of punitive damages, where the plaintiff was not required to demonstrate that the defendant had acted with knowledge that its conduct violated the terms of the gender discrimination statute; where, from evidence that the defendant had policies prohibiting harassment, the jury could infer that the defendant was aware that gender discrimination was not legally permitted; where there was sufficient evidence of the defendant's reprehensible or recklessly indifferent conduct to support the award of punitive damages; and where the award was not excessive. [106-110]

Discussion of the new standard, in an action alleging discrimination in employment, for determining whether an employer's conduct was so outrageous or egregious that punitive damages are warranted. [110-111]

At the trial of a civil complaint alleging discrimination in employment, the judge did not err in admitting evidence that was relevant to a determination of pretext [111-112]; moreover, an improper remark made during the plaintiff's closing argument was not likely to have altered the outcome of the case [112]; further, the plaintiff produced sufficient evidence to justify a mixed motive instruction, and error arising from the judge's failure to make clear what the plaintiff's burden was before the burden shifted to the defendant was harmless in the circumstances [112-115].

CIVIL ACTION commenced in the Superior Court Department on September 9, 2005.

The case was tried before *John A. Agostini*, J., and a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial or remittitur was heard by him.

The Supreme Judicial Court granted an application for direct appellate review.

*Robert S. Mantell* (*Richard E. Fradette*, of New Hampshire, & *David E. Belfort* with him) for the plaintiff.

*David C. Casey* (*Stephen T. Melnick* with him) for the defendant.

*Jo Ann Shotwell Kaplan, Martin J. Newhouse, & John R. Pagliaro*, for New England Legal Foundation & another, amici curiae, submitted a brief.

*Patricia A. Washienko*, for Jewish Alliance for Law and Social Action & others, amici curiae, submitted a brief.

COWIN, J. The plaintiff filed a complaint in the Superior Court against Wal-Mart Stores, Inc. (Wal-Mart), alleging unequal compensation and termination of employment based on gender in violation of G. L. c. 151B, § 4 (1). The complaint also included claims for defamation.[1] Following a jury trial, Wal-Mart was found liable on the G. L. c. 151B, § 4 (1), claim, and the plaintiff

---

[1] Claims for wrongful termination in violation of public policy (whistle-blower); retaliatory discharge in violation of G. L. c. 151B, § 4 (4); violations of G. L. c. 149, § 148 (payment of wages statute), and G. L. c. 149, § 150A (equal pay act); breach of contract; intentional infliction of emotional distress; and interference with contractual relations against Wal-Mart and certain individually named Wal-Mart employees were dismissed on the defendants' motion for summary judgment.

was awarded $972,774 in compensatory damages and $1 million in punitive damages.[2]

Wal-Mart moved for judgment notwithstanding the verdict or, in the alternative, for remittitur or a new trial. The motion judge, who was also the trial judge, vacated the award of punitive damages but otherwise denied the motion. The parties cross-appealed; we granted the plaintiff's motion for direct appellate review.

On appeal, Wal-Mart claims that the judge erred in denying its motion for judgment notwithstanding the verdict as to the gender discrimination claim, and in declining to reduce the front pay award. Wal-Mart asserts also that a new trial is required because of the improper admission of certain evidence, misconduct in the plaintiff's closing argument, and errors concerning two jury instructions. In her cross appeal, the plaintiff claims that the judge erred in allowing Wal-Mart's motion for judgment notwithstanding the verdict with respect to punitive damages.

We conclude that there was sufficient evidence for the jury to find that Wal-Mart's proffered motive for the plaintiff's termination was a pretext, and consequently that Wal-Mart acted with a discriminatory animus. We conclude also that there was sufficient evidence to support the jury's award of front pay damages. None of Wal-Mart's claims regarding the trial convince us that the judge was wrong in denying the defendant's motion on the basis of the asserted errors in the trial proceedings.[3] Accordingly, we affirm the judge's decision denying the defendant's motion for judgment notwithstanding the verdict on the liability and front pay claims.

We do, however, conclude that the judge erred in regard to the punitive damages award. He determined incorrectly that the jury were not warranted in finding intentional and outrageous conduct (a precondition for punitive damages). His decision is

---

[2]The jury found that Wal-Mart made defamatory statements about the plaintiff, but concluded that there was no liability on that claim because the plaintiff had suffered no damages as a result.

[3]The jury awarded $17,700 in special damages, $125,000 in emotional distress damages, back pay of $95,000, and front pay of $733,307. See *Stonehill College* v. *Massachusetts Comm'n Against Discrimination*, 441 Mass. 549, 567-568, cert. denied sub nom. *Wilfert Bros. Realty Co.* v. *Massachusetts Comm'n Against Discrimination*, 543 U.S. 979 (2004) (to effectuate remedial purpose of statute, compensatory damages include those which are "natural and probable consequences" of discriminatory act).

also confusing because it suggests, at least in part, and contrary to his proper instruction to the jury, that punitive damages could not be awarded unless it was proved that Wal-Mart acted with the specific knowledge that it was deliberately violating the anti-discrimination statute, G. L. c. 151B. We therefore vacate the judge's order and reinstate the jury's award of punitive damages.

The plaintiff argues also that our standard for awarding punitive damages should be modified so that a showing of intentional discrimination alone suffices for an award of punitive damages. While we decline the plaintiff's invitation to modify the standard in this respect, we take this opportunity to set forth a new standard in language that more clearly describes the considerations necessary for an award of punitive damages in the specific context of a discrimination claim.

1. *Factual background.* Because Wal-Mart alleges that the evidence was insufficient, we summarize the evidence in the light most favorable to the plaintiff.[4,5] The plaintiff, Cynthia Haddad, worked as a pharmacist at Wal-Mart for ten years, seven of those in Wal-Mart's Pittsfield store. Pursuant to Massachusetts law and regulation, every pharmacy must have a "manager of record." The manager of record, who must be a registered pharmacist, is responsible for complying with State and Federal reporting requirements and supervising the pharmacy staff. A registered pharmacist must be on duty during a pharmacy's hours of operation. See, e.g., G. L. c. 112, §§ 24, 39; 247 Code Mass. Regs. §§ 6.01, 6.02, 6.07 (2005). During the period at issue, Wal-Mart employed one pharmacist at its Pittsfield store, who was designated the "pharmacy manager," to serve as the "manager of record." A staff pharmacist generally worked under

---

[4]We reserve some details for later discussion.

[5]In determining whether a motion for judgment notwithstanding the verdict pursuant to Mass. R. Civ. P. 50 (b), as amended, 428 Mass. 402 (1998), was properly denied, we consider "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' " *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 470 (1993), quoting *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978). The evidence is reviewed in the light most favorable to the plaintiff, "without weighing the credibility of the witnesses or otherwise considering the weight of the evidence." *Bavuso* v. *Caterpillar Indus., Inc.*, 408 Mass. 694, 695 n.1 (1990), quoting *Tosti* v. *Ayik*, 394 Mass. 482, 494 (1985), *S.C.*, 400 Mass. 224, cert. denied sub nom. *United Auto Workers, Local 422* v. *Tosti*, 484 U.S. 964 (1987).

the pharmacy manager, and several pharmacy technicians (who are not registered pharmacists) assisted the staff pharmacist. At times, only one pharmacist would be on duty. In addition to their hourly wages as pharmacists, pharmacy managers received an additional hourly stipend as well as an annual bonus.

For most of the plaintiff's tenure at Wal-Mart, she served as staff pharmacist; she received consistently excellent evaluations. In March, 2003, the plaintiff accepted the position of pharmacy manager on a temporary basis.[6] At that time, and until her termination thirteen months later, the plaintiff was paid at an hourly rate considerably lower than any male pharmacy manager in the Pittsfield region. In addition, although she was told that she would receive the additional hourly pay that Wal-Mart paid all pharmacy managers, she did not receive this differential. After numerous complaints, on April 9, 2004, she finally received a check for the pharmacy manager bonus that others received in February, but she never received the thirteen months' worth of additional hourly pay.

On April 14, 2004, Wal-Mart district manager David Hogan and two other Wal-Mart managers met with the plaintiff at the Pittsfield store. They questioned her about two prescriptions that had been fraudulently written and filled by pharmacy technician Kristin Baran.[7] One of the prescriptions had been written in October, 2002, while the plaintiff was on duty, and one was written on March 20, 2004, while a male pharmacist, Richard Blackbird, was on duty. Baran admitted, immediately after the meeting between the Wal-Mart supervisors and the plaintiff, that she falsified the October, 2002, prescription.

The plaintiff denied any knowledge of the fraudulent prescriptions, but told Hogan that the first one could have been written when she briefly left the pharmacy area to purchase a soda at a nearby counter; when she was in the restroom; when she was in the front of the pharmacy talking to customers; or when she was in the back of the pharmacy eating lunch or counting narcotics. The plaintiff's employment was terminated that same day. She was told that the reason for her termination was based on

[6]The plaintiff advised Wal-Mart that she did not want to accept the position permanently because of her child-care responsibilities.

[7]Pharmacy technicians are prohibited by statute and by Wal-Mart policy from filling prescriptions.

her statement during the interview that she "fail[ed] to secure the pharmacy" because, in violation of an unspecified Wal-Mart policy, she had briefly left the pharmacy area unsecured, leaving Baran unattended in the pharmacy area. Baran's employment was also terminated the same day.

The more recent fraudulent prescription contained Blackbird's initials. Neither Blackbird, who was on duty when the second fraudulent prescription was written, nor any other pharmacist was questioned about or disciplined for it. Indeed, Blackbird was appointed to be pharmacy manager at the time of the plaintiff's departure.[8] Blackbird testified that he commonly left the pharmacy area unsecured to talk to a customer in the over-the-counter area, to go to the restroom, or to get a snack; he was unaware of any policy prohibiting this practice and was never disciplined for doing so. Other testimony at trial indicated that it was common practice for pharmacists to leave the pharmacy area briefly unsecured[9] and go to other areas of the store during their shifts. Copies of Wal-Mart's written policy regarding lunch breaks, effective in October of 2002 and introduced in evidence, indicated that it was optional whether a pharmacy manager closed and locked the pharmacy during lunch breaks. There was also evidence that this policy later changed several times.

Wal-Mart employees gave inconsistent reasons for the plaintiff's termination and were also inconsistent regarding who was responsible for the decision. Answers to interrogatories, submitted by Hogan on his own behalf and on behalf of Wal-Mart,[10] were introduced at trial. In these answers, Hogan stated, contrary to his trial testimony, that the plaintiff's employment was terminated because she had not properly monitored store charge accounts and had allowed a technician to maintain a charge account.[11] Hogan testified that he told the store manager that the

---

[8]Wal-Mart employees testified that Wal-Mart did not further investigate the second fraudulent prescription because Baran did not admit to having forged that prescription. However, Baran's admission that she forged one of the prescriptions was made after the plaintiff's exit interview.

[9]Testimony indicated that Wal-Mart defined "securing the pharmacy" to include removing the technicians from the pharmacy.

[10]Hogan was originally named as an individual defendant. These claims were dismissed on summary judgment.

[11]Testimony by other male pharmacy managers indicated that they were unaware of a policy prohibiting employees from maintaining charge accounts.

plaintiff was terminated for allowing controlled drug losses. Another district manager told Blackbird that the plaintiff was terminated because of discrepancies in the controlled drug inventory. In addition, Hogan testified on direct examination that he made the decision to fire the plaintiff for her failure to secure the pharmacy; however, on cross-examination, after being shown his answers to interrogatories, Hogan testified that he had been "instruct[ed]" to fire the plaintiff by his supervisor, the regional manager, and that he was told to give the reason as "gross misconduct." Moreover, the plaintiff's "exit interview" forms, signed by three Wal-Mart managers, were dated April 13, 2004,[12] the day before the termination, and indicated the reason for the plaintiff's termination as "gross misconduct . . . misappropriation." Another explanation offered for the plaintiff's termination was that she gave pharmacy technicians her computer sign-on codes.

According to the record in this case, at the time of the plaintiff's termination, in the geographic district containing the Pittsfield store, twenty of the twenty-one managers above the pharmacy manager level at Wal-Mart were male, and all the pharmacy technicians were female. Only two of the pharmacy managers of the fifteen stores in the district were females.

2. *Sufficiency of the evidence.* Wal-Mart argues that the judge erred in denying its motion for judgment notwithstanding the verdict, Mass. R. Civ. P. 50 (b), as amended, 428 Mass. 1402 (1998), on the discrimination claim because there was "no evidence" to support a finding of discriminatory animus. There was no error.[13]

The evidence was sufficient for the jury to find that Wal-Mart acted with a discriminatory animus in terminating the plaintiff's employment. Wal-Mart does not dispute that the plaintiff met her burden of establishing all the elements in the first stage of the three-stage *McDonnell Douglas* analysis.[14] See *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792, 802 (1973); *Abramian*

[12]Some of these dates were later written over as "April 14, 2004."

[13]See note 5, *supra,* setting forth the standard for determining whether a motion for judgment notwithstanding the verdict pursuant to Mass. R. Civ. P. 50 (b) was properly denied.

[14]When a plaintiff makes a G. L. c. 151B claim of termination based on gender discrimination in circumstances where, as here, there is no direct

v. *President & Fellows of Harvard College*, 432 Mass. 107, 118 (2000). Wal-Mart offered several facially valid reasons for the plaintiff's termination. Therefore, if the jury were warranted in concluding that at least one of the proffered reasons for the plaintiff's termination was a pretext, that alone would constitute sufficient evidence to support an inference that Wal-Mart acted with a discriminatory animus. See *Lipchitz* v. *Raytheon Co.*, 434 Mass. 493, 499-502, 504 (2001). There was ample evidence from which a jury could have inferred that Wal-Mart's stated reasons were pretexts, and consequently that Wal-Mart acted with discriminatory intent.

The jury could have decided that all of Wal-Mart's proffered reasons for terminating the plaintiff's employment were false. Hogan testified to one reason: that the plaintiff had failed to secure the pharmacy area, that is, that she left the area to get a soda, leaving only a technician present. The jury could have concluded that this statement was false for several reasons. First, Wal-Mart employees, including Hogan, had previously given a variety of conflicting reasons for the termination. Additionally, the incident had occurred eighteen months prior to the termination. Furthermore, there was testimony that male pharmacists routinely left the pharmacy to purchase food or beverages in the store or to assist customers.

The jury could also have determined that the reason initially checked on the exit interview form — "gross misconduct . . . misappropriation" — was false because there was no evidence or even any allegation that the plaintiff misappropriated assets. In addition, Hogan testified that the decision to fire the plaintiff was made at her April 14, 2004, interview, after she stated that she might have left the pharmacy area, possibly to get a soda.

evidence of discrimination, we have followed a three-stage analysis. First, the plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff does so, the defendant may rebut the inference of discrimination thus established by offering a legitimate, nondiscriminatory reason for its employment action. Once the defendant does so, the plaintiff may, in the third stage of the proceedings, produce evidence that the defendant's stated reason for its action was not the real one, but rather a pretext. Such evidence allows, but does not compel, the jury to infer a discriminatory animus, which is an essential element of a claim under G. L. c. 151B. See *Knight* v. *Avon Prods., Inc.*, 438 Mass. 413, 420 (2003); *Abramian* v. *President & Fellows of Harvard College*, 432 Mass, 107, 116-118 (2000).

The jury could have concluded, moreover, that the plaintiff's termination had been planned in advance of her interview. Her termination notice was originally dated on the day before the interview, and Hogan testified further that he told the regional manager, the day before the plaintiff's termination, that he intended to interview and then terminate the plaintiff on the following day. Moreover, the jury could have rejected Hogan's statement that the plaintiff was fired for allowing a technician to maintain a charge account, well before the termination, because there was testimony that male pharmacists were unaware of any policy prohibiting such accounts, there was no evidence that any other pharmacist had been disciplined for allowing the account to remain open, and there was evidence that the plaintiff had closed the account on the day she was told to do so by a Wal-Mart manager. Lastly, the jury could have chosen not to credit Hogan's statement that the plaintiff was fired because she disclosed her computer sign-on code to a technician. The plaintiff testified that she had never disclosed her password to anyone, and a number of Wal-Mart employees testified that it was routine practice for pharmacists to log onto the computer in the morning and to stay logged on all day, so that a technician could easily use the pharmacist's computer account.

In addition, there was substantial evidence that the jury could have credited that similarly situated male pharmacists were treated differently than the plaintiff for similar infractions of Wal-Mart policy. See *Trustees of Health & Hosps. of Boston, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 449 Mass. 675, 683-686 (2007) (similarly situated comparator is usually most probative means of proving adverse action was taken for discriminatory reasons). As stated, there was evidence that male pharmacists routinely left the pharmacy area unsecured in order to purchase snacks or drinks, and that no other pharmacist had been terminated for such a reason. There was also evidence that the policy on lunch breaks did not mandate that a pharmacist secure the pharmacy before leaving the pharmacy area. The then-effective policy stated that a pharmacist "may" close and lock the pharmacy if only one pharmacist was on duty and was going on a meal break, and that the pharmacist "may" leave the pharmacy area, but should not leave the building.

In circumstances virtually identical to the incident for which

the plaintiff was purportedly terminated, a male pharmacist was neither questioned about nor disciplined for the second fraudulent prescription filled by Baran, even though his initials were on the prescription, he was on duty at the time it was filled, the prescription appeared suspicious on its face, and the incident had occurred only a few weeks, rather than eighteen months, before the plaintiff's termination.[15] Indeed, the evidence indicated that the investigation of the second fraudulent prescription was limited to questioning the plaintiff about it and thereafter asking Baran whether she had written it.

There was evidence of other incidents in which male pharmacists were not disciplined for far more serious infractions of Wal-Mart policies, or even for actions that violated State and Federal law. For instance, a videotape from a surveillance camera showed Baran placing drugs in her purse while the male pharmacist on duty, Hershel Patel, was standing near her; Wal-Mart policy prohibited bringing purses into the pharmacy area. Patel, who remained employed by Wal-Mart at the time of trial, testified that he was not questioned or disciplined about the incident.[16] In August, 2003, Wal-Mart discovered that another male pharmacist, Jerry Campagna, had been writing prescriptions for himself for a level "C-II" narcotic; this practice violated State and Federal law as well as Wal-Mart policy. A district manager instructed Campagna to have a prescription written by his physician, and no disciplinary action was taken against Campagna for these prescriptions. Campagna was also later observed taking drugs from the pharmacy area; his employment was not terminated for this conduct.

The jury's finding of Wal-Mart's discriminatory animus was supported by additional evidence. Even if the jury believed that the plaintiff was terminated for leaving the pharmacy area without removing a pharmacy technician from the pharmacy area in October, 2002, the plaintiff at that time was a staff pharmacist and not the pharmacy manager legally responsible for seeing that the pharmacy was secure. The plaintiff was not appointed

[15]Although not a pharmacy manager at the time of this incident, the male pharmacist was in charge of the pharmacy when the incident occurred.

[16]Hogan testified, however, that Patel was verbally "counseled" or "coached" concerning the incident, but, in any event, Patel was told he "was not doing anything wrong, but he was not paying attention."

to the pharmacy manager position until March, 2003. Moreover, the jury could have concluded that terminating the plaintiff's employment for a single policy infraction did not comport with Wal-Mart's stated policy of progressive discipline, with employees first "coached" about proper procedures, then suspended, and then, in extreme circumstances, terminated from employment.[17]

There was also evidence that the plaintiff's base pay was significantly less per hour than all the male pharmacy managers in the Pittsfield region. In addition, despite the plaintiff's repeated requests for the additional hourly pay and bonus that Wal-Mart's pharmacy managers received, Wal-Mart denied the plaintiff the bonus until just before her termination.

Wal-Mart argues that its decision to investigate only the plaintiff and none of the male pharmacists regarding the fraudulent prescriptions is "legally irrelevant, and cannot support an inference of discrimination." Wal-Mart asserts that it did not investigate or discipline Blackbird (the pharmacist on duty when Baran wrote the second fraudulent prescription) because "[n]o Wal-Mart decision maker had any reason to suspect that Blackbird had engaged in wrongdoing, let alone actual awareness of such problems." This argument is without merit. The jury heard evidence that Wal-Mart questioned the plaintiff about both the prescription Baran wrote when the plaintiff was on duty and the one written when Blackbird was on duty, but did not question Blackbird about either prescription. Given the evidence of the fraudulent prescription with Blackbird's initials, Wal-Mart clearly had as much reason to suspect that Blackbird was engaged in wrongdoing as it did to suspect the plaintiff.

Wal-Mart maintains also that a male pharmacist, Campagna, was observed on videotape leaving the pharmacy, and that his employment was terminated because he, like the plaintiff, left the pharmacy area while on duty. However, Campagna's actions were not comparable to the plaintiff's. Unlike the plaintiff, Campagna left the Wal-Mart building and drove away from the store during his shift. The policy on lunch breaks provided that securing the pharmacy area was optional when only one pharmacist was on duty, but several Wal-Mart policies explicitly prohibited an on-duty pharmacist from leaving the store building.

---

[17]Wal-Mart policy did permit immediate termination (with no "coaching") for an employee who committed "gross misconduct."

3. *Front pay.* Pursuant to Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974), Wal-Mart moved for remittitur of the jury's awards of front and back pay, or, alternatively, for a new trial. The judge denied Wal-Mart's motion for remittitur or for a new trial on the front and back pay awards. On appeal, Wal-Mart contests only the issue of the front pay award.

Front pay is intended to compensate a plaintiff for the loss of future earnings caused by the defendant's discriminatory conduct; it is not a punitive award and should not generate a windfall for the plaintiff. See *Handrahan* v. *Red Roof Inns, Inc.*, 43 Mass. App. Ct. 13, 24 (1997), citing *Conway* v. *Electro Switch Corp.*, 402 Mass. 385, 388 (1988). See also *Handrahan* v. *Red Roof Inns, Inc.*, 48 Mass. App. Ct. 901, 901-902 (1999). Wal-Mart argues that the front pay award is excessive and speculative; that the judge, in his decision denying remittitur, failed to consider evidence of the plaintiff's future earning ability; and that a nineteen-year award is too long. While the award of $733,307 represents a significant dollar figure for front pay, the evidence supported such an award. See *Beaupre* v. *Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 496 n.26 (2000), citing *Kolb* v. *Goldring, Inc.*, 694 F.2d 869, 871 (1st Cir. 1982) (jury award proper as long as it does not exceed any "rational appraisal or estimate" of damages).

The judge properly instructed the jury that front pay damages must be "proven with reasonable certainty," that in awarding such damages they should consider the "amount of future earnings, including salary, bonuses and benefits that the [p]laintiff would have received but for the [d]efendant's unlawful discrimination," that they should not overcompensate the plaintiff, and that the plaintiff had a duty to mitigate her damages by reasonable efforts to secure other employment. The duty to mitigate was properly defined. See Massachusetts Superior Court Civil Practice Jury Instructions § 5.3.3 (Mass. Cont. Legal Educ. 2d Supp. 2001). The judge also correctly instructed the jury to consider and weigh five factors in determining the amount of any front pay award: (1) the amount of earnings, including salary and benefits, that the plaintiff would have received between the time of trial and the plaintiff's projected retirement date[18]; (2) the plaintiff's probable retirement date; (3) the amount of

---

[18]Base pay compensates a plaintiff for lost wages from the time of termina-

earnings that the plaintiff would probably have received from another employer until her retirement, which would reduce any front pay award; (4) the availability of other employment opportunities; and (5) the possibility of future wage increases and inflation. See *id.* The judge further instructed that any award of front pay damages must be based on the present discounted value of the income stream, and he provided an explanation of how that value was to be calculated. See *id.* Wal-Mart did not object to these instructions.

The plaintiff testified to her difficulty in obtaining a new job. There was evidence that Wal-Mart's allegations concerning her alleged responsibility for drug losses became generally known. After more than six months of seeking employment, she eventually secured a position at a small pharmacy with less advancement potential, significantly fewer benefits, and fewer available hours.[19] She remained in that position at the time of trial; the evidence suggested that the plaintiff intended to stay in the Pittsfield area and to continue working at her present type of job as a pharmacist. Her tendency to job stability was supported by evidence that she had worked at Wal-Mart for ten years. While Wal-Mart emphasizes that the plaintiff's hourly pay in the new job is higher than at Wal-Mart, the plaintiff in fact earns less money than she did before termination of her employment because fewer hours are available in her new position than had been available to her during her employment at Wal-Mart.

Expert testimony is not required to support an award of front pay. See *Griffin* v. *General Motors Corp.*, 380 Mass. 362, 366 (1980). See also *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 484-486 (1993). Nonetheless, the plaintiff introduced testimony from an expert in economics and finance whose qualifications were not challenged by Wal-Mart. The plaintiff's expert testified that, depending on various assumptions, the plaintiff would suffer a loss of front pay, discounted to present value, of between $700,000 and $1,600,000. See *Conway* v. *Electro Switch Corp.*, 402 Mass. 385, 388 n.3 (1988) (front pay award must be discounted to present value). These figures were based on the difference between the plaintiff's salary at Wal-Mart and the

---

tion through the time of trial. See Massachusetts Superior Court Civil Practice Jury Instructions § 5.3.2 (Mass. Cont. Legal Educ. 2d Supp. 2001).

[19]This pharmacy was owned by a relative of her in-laws.

salary she earned at her new job; the assumption that she would work from her age at the time of trial (forty-six) until her estimated retirement age of sixty-five; the length of her employment at Wal-Mart and the excellent nature of her reviews; the limited geographic market in which she worked (Pittsfield, a city with a limited number of pharmacies); and the difficulty in finding other employment. See *Conway* v. *Electro Switch Corp.,* *supra* at 387-390; *Handrahan* v. *Red Roof Inns, Inc.,* 48 Mass. App. Ct. 901, 901-902 (1999). The expert testified also that it would be impossible for the plaintiff to recoup the ten years of seniority the plaintiff had earned at Wal-Mart or to find a position with comparable seniority.

Wal-Mart introduced no contrary evidence. The jury awarded an amount towards the lower end of the expert's estimate of front pay; the award was based on the evidence, apparently was properly discounted to present value, and was not speculative.

Wal-Mart contends that a nineteen-year award is excessive. However, the award of lost income of nineteen years is consistent with the plaintiff's anticipated retirement age of sixty-five. Based on the plaintiff's ten-year tenure at Wal-Mart, her testimony that she had planned to continue working at Wal-Mart for the remainder of her career, and the limited number of pharmacies in the area around Pittsfield, the jury permissibly could have concluded that an award of nineteen years was appropriate. While the longer the time period of the award, "the less likely it is that the loss of future earnings can be demonstrated with any degree of certainty or can reasonably be attributed to the illegal conduct of the employer," *Conway* v. *Electro Switch Corp., supra* at 389, the jury could have determined that the small number of comparable employment opportunities, aggravated by the plaintiff's difficulty in obtaining other employment because her reputation in the local pharmacist community had been harmed by Wal-Mart's allegations, justified the nineteen-year award.

Lengthy front pay awards have been sustained under G. L. c. 151B, as well as under Federal law, where circumstances indicated that plaintiffs would have difficulty in obtaining comparable employment. See, e.g., *Ventrusco* v. *Liberty Mut. Ins. Co.,* 55 Mass. App. Ct. 201, 210 (2002) (fourteen years of future lost pension benefits where plaintiff had been "employed continuously . . . for twenty-four years and [had] fully intended

to remain at [prior employer] for an additional fourteen years when he would turn sixty-five"); *Handrahan* v. *Red Roof Inns, Inc.*, *supra* (thirty-year front pay award where jury's assumption that plaintiff would have continued working at same employer for thirty years was "reasonable given the judge's unchallenged charge to the jury to consider how long the plaintiff would [have] remain[ed] as an employee of [the defendant] and the evidence of her earnings history and her intention to continue her employment with the defendant for the rest of her working life"). See also *Kelley* v. *Airborne Freight Corp.*, 140 F.3d 335, 355-356 (1st Cir.), cert. denied, 525 U.S. 932 (1998) ($1 million in front pay damages under Massachusetts law for forty-six year old plaintiff until his retirement age of sixty-five, where testimony was that because of plaintiff's lack of education he would not be able to obtain job at comparable salary); *Padilla* v. *Metro-North Commuter R.R.*, 92 F.3d 117, 125-126 (2d Cir. 1996), cert. denied, 520 U.S. 1274 (1997) (front pay award for "well over [twenty] years" until age sixty-seven reasonable under Federal antidiscrimination statute where plaintiff did not attempt to obtain comparable employment, but rather worked at lower-paying position, because of unique and specialized nature of his work, employer's failure to show that plaintiff could obtain comparable work, and purpose of front pay damage awards, which is to ensure that victims of discrimination are made whole); *Tyler* v. *Bethlehem Steel Corp.*, 958 F.2d 1176, 1189 (2d Cir.), cert. denied, 506 U.S. 826 (1992) (front pay award for seventeen years in total amount of $667,000).

Wal-Mart submits that the plaintiff could earn more money had she applied to another pharmacy chain suggested by a recruiter. It is speculative that the plaintiff would have been hired for this job. Moreover, the plaintiff testified that she previously had been rejected for a position by that same chain, and that, when the recruiter contacted her about the position, she had begun working for her current employer. The jury could have concluded justifiably that the plaintiff had made reasonable efforts to secure new employment and that she had no obligation to reapply to a chain that had previously rejected her.[20] See *Padilla* v. *Metro-North Commuter R.R.*, *supra* at 125, quoting *Clarke* v. *Frank*,

_____

[20]In considering Wal-Mart's motion for remittitur, the judge explicitly

960 F.2d 1146, 1152 (2d Cir. 1992) (under duty to mitigate, plaintiff is required to "use reasonable diligence in finding other *suitable* employment," and employer "bears the burden of proving that suitable work existed, and that the employee did not make reasonable efforts to obtain it"). Wal-Mart suggests that the plaintiff could have obtained full-time employment to increase her income and mitigate her damages.[21] The plaintiff, however, did not work full-time while at Wal-Mart because of child-care responsibilities. The expert's figures, which incorporated varying assumptions concerning the plaintiff's future position and what her position would have been at Wal-Mart, included the assumption that the plaintiff would begin working full-time once her youngest child finished high school.[22]

4. *Punitive damages.* The judge instructed the jury on punitive damages in accord with *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.),* 427 Mass. 1, 17-17a (1998), and neither party contends that these instructions were faulty. Wal-Mart claims, however, as it did at trial, that the instruction should not have been given because there was insufficient evidence to justify an award of punitive damages.

Wal-Mart moved alternatively for judgment notwithstanding the verdict or for remittitur or a new trial on the award of punitive damages. Concluding that the plaintiff had "presented no evidence that Wal-Mart knowingly or intentionally violated G. L. c. 151B," and that there was no evidence that Wal-Mart's conduct was "otherwise outrageous, evil in motive, or that it could be viewed as exhibiting a reckless indifference for the plaintiff's rights," the judge allowed Wal-Mart's motion for judgment notwithstanding the verdict on the punitive damages award.

stated that there was evidence from which the jury could have found that the plaintiff had not failed to mitigate her damages.

[21]To support its contention that the plaintiff could have obtained employment at another pharmacy, Wal-Mart requests that we take judicial notice of certain United States Bureau of Labor statistics and Internet search results from a single search engine concerning the number of pharmacies within a certain distance from Pittsfield. In determining whether the jury's award was justified, we cannot consider statements not before the jury.

[22]The expert testified that his low-end and high-end numbers were based on differing assumptions regarding whether the plaintiff (a) would have worked full- or part-time at Wal-Mart after her youngest child completed school; (b) would have done so at her current position; and (c) would have worked as a staff pharmacist or as a pharmacy manager.

The plaintiff maintains that the judge erred in allowing the motion. We agree. Under the existing standard, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.)*, *supra* at 17a, quoting Restatement (Second) of Torts § 908(2) (1979). An award of punitive damages requires a determination of the defendant's intent or state of mind, determinations properly left to the jury, whose verdict should be sustained if it could "reasonably have [been] arrived at . . . from any . . . evidence . . . presented." *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.)*, *supra* at 16, citing *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 821 (1997).

The decision on the motion contains an implication that the judge may well not have intended, i.e., that punitive damages may be awarded under G. L. c. 151B for gender discrimination only if the plaintiff shows that the defendant acted with knowledge that its conduct violated the terms of that specific statute.[23] That is true only for awards of punitive damages in age discrimination cases. See G. L. c. 151B, § 9. This may not have been what the judge intended to convey, particularly given that his instructions to the jury on punitive damages properly included no such requirement. Our cases have held that if a defendant knows that it has acted unlawfully by interfering with the legally protected rights of the plaintiff, such "reckless indifference" to

---

[23]The Federal standard mandates that, to be liable for punitive damages, an employer "must act with 'malice or reckless indifference to the plaintiff's federally protected rights.' " *Kolstad* v. *American Dental Ass'n*, 527 U.S. 526, 535 (1999), quoting 42 U.S.C. § 1981a(b)(1). Such a state of mind requires that the employer "must at least discriminate in the face of a perceived risk that its actions will violate [F]ederal law." *Id.* at 536. Under Federal law, however, "in general, intentional discrimination," such as "intentional discriminatory retaliation," meets the requirement that the defendant act with reckless indifference to the plaintiff's federally protected rights, and "is enough to establish punitive damages liability" (citations omitted). *Che* v. *Massachusetts Bay Transp. Auth.* 342 F.3d 31, 41 (1st Cir. 2003). Massachusetts has not incorporated a requirement that the defendant be aware that its actions violate legally protected rights in order to be liable for punitive damages, except in cases involving discrimination based on age. See G. L. c. 151B, § 9 (requiring punitive damage award of minimum two and maximum three times actual damages for age discrimination if act or practice was committed with knowledge or reason to know that it violated G. L. c. 151B, § 4).

the rights of others constitutes conduct warranting "condemnation and deterrence," *Bain* v. *Springfield*, 424 Mass. 758, 767 (1997), and could be sufficient to support an award of punitive damages. See *Clifton* v. *Massachusetts Bay Transp. Auth.*, 445 Mass 611, 623-624 (2005); *Goodrow* v. *Lane Bryant, Inc.*, 432 Mass. 165, 178-179 (2000); *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.)*, *supra* at 17a. See also *Zimmerman* v. *Direct Fed. Credit Union*, 262 F.3d 70, 84 (1st Cir. 2001); *Dichner* v. *Liberty Travel*, 141 F.3d 24, 33-34 (1st Cir. 1998). That the defendant acted with the knowledge that it was interfering with the plaintiff's right to be free of unlawful discrimination, however, has been only one circumstance warranting an award of punitive damages. If the defendant's act was otherwise outrageous, egregious, evil in motive, or undertaken with reckless indifference to the rights of others, an award of punitive damages has been allowed. We review the judge's decision under this standard.

Although the judge concluded that there was no evidence that Wal-Mart knowingly or intentionally violated G. L. c. 151B, there was evidence that Wal-Mart had policies prohibiting harassment from which a jury could infer that Wal-Mart was aware that gender discrimination was not legally permitted.[24] In addition, contrary to the judge's conclusion, there was sufficient evidence of reprehensible or recklessly indifferent conduct to support an award of punitive damages. We have discussed previously evidence of Wal-Mart's refusing to pay the plaintiff the hourly pay differential it paid male pharmacy managers, and firing a ten-year employee for a single infraction, after what the judge said the jury could have found was a "sham" investigation, when male pharmacists were not investigated or disciplined for similar or far more serious infractions.

The additional level of egregiousness necessary to support an award of punitive damages could be found also in evidence of Wal-Mart's unequal treatment of the plaintiff and a male pharmacist concerning investigations for narcotics losses. Wal-Mart hired as a pharmacy manager a male pharmacist who was under

---

[24]Wal-Mart maintained policies prohibiting harassment and "inappropriate conduct." Wal-Mart training manuals provided for "coaching" on "harassment/ inappropriate conduct." By contrast, Wal-Mart considered "serious harassment/ inappropriate conduct" to be "gross misconduct" justifying immediate termination without the possibility of future rehire.

criminal investigation for narcotics losses at another pharmacy and therefore was unable to obtain a pharmacy manager's license. Wal-Mart appointed the plaintiff to perform the legally-mandated functions as pharmacy "manager of record" because the male pharmacist did not have the required license. Nevertheless, the male pharmacist was paid substantially more per hour than the plaintiff. The plaintiff was told that the male pharmacist would perform pharmacy "business" functions. The jury could have refused to credit this explanation.

When the plaintiff observed discrepancies in controlled substance counts, she reported these to Wal-Mart management. When Wal-Mart failed to file the State-mandated reporting forms, and the plaintiff filed the forms as required to maintain her license, she was reprimanded for doing so. The male pharmacist was later discovered stealing narcotics from Wal-Mart, and his employment was neither suspended nor terminated. After the plaintiff's termination, Wal-Mart filed the same State-mandated loss forms concerning the plaintiff; she was eventually cleared of any wrongdoing after a year-long State investigation.

Wal-Mart contends further that the award of $1 million in punitive damages was excessive. In considering whether an award of punitive damages is excessive in a gender discrimination case, we analyze three factors: " 'the degree of reprehensibility of the defendant's conduct,' the ratio of the punitive damage award to the 'actual harm inflicted on the plaintiff,' [and] a comparison of 'the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct.' " *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 826-827 (1997), quoting *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 575, 580, 583 (1996). The jury were warranted in concluding that Wal-Mart's pattern of unequal treatment of male and female pharmacists was outrageous and reprehensible. The close to one-to-one ratio here between compensatory damages and punitive damages comports with due process requirements and the goals of deterrence. See *Clifton* v. *Massachusetts Bay Transp. Auth.*, 445 Mass. 611, 623-624 (2005); *Ciccarelli* v. *School Dep't of Lowell*, 70 Mass. App. 787, 798-799 (2007).

Notwithstanding that the plaintiff agrees with the judge's instruction that an award of punitive damages requires an "evil motive or . . . reckless indifference to the rights of others," the

plaintiff contends that a finding of intentional discrimination alone has been "generally" sufficient for an award of punitive damages because intentional discrimination by itself establishes "evil motive." This is incorrect. While discrimination of all types is wrong and unacceptable, certain discriminatory conduct is more outrageous than others. Punitive damages have been, and remain, permissible only where the defendant's behavior is particularly outrageous or egregious.

As stated, neither party claims error in the judge's instruction on punitive damages, and there was none. We take this opportunity, however, to set forth a new standard describing the circumstances in which punitive damages may be awarded. We have in the past used the Restatement (Second) of Torts standard to support an award of punitive damages. See *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.)*, 427 Mass. 1, 17a (1998), citing Restatement (Second) of Torts § 908(2) (1979). Because many States, unlike Massachusetts, allow punitive damages in negligence cases, this standard was created, at least in part, to address the point at which, in a negligence action in those States, the conduct rises to a level justifying punitive damages. See Restatement (Second) of Torts § 908 comment b, at 464-465 (1979). We impose punitive damages only when authorized by statute. See *International Fidelity Ins. Co.* v. *Wilson*, 387 Mass. 841, 856 n.20 (1983). Discrimination necessarily involves an intentional act, and therefore, no additional language distinguishing intentional and negligent acts is required. We now fashion a definition of outrageous conduct appropriate specifically for discrimination claims, to be applied in (1) all claims for punitive damages under G. L. c. 151B commenced after the date of the rescript in this opinion, and (2) all pending claims that have not gone to judgment in the trial court by such date.

To sustain an award of punitive damages under G. L. c. 151B, § 4, a finding of intentional discrimination alone is not sufficient. An award of punitive damages requires a heightened finding beyond mere liability and also beyond a knowing violation of the statute. Punitive damages may be awarded only where the defendant's conduct is outrageous or egregious. Punitive damages are warranted where the conduct is so offensive that it justifies punishment and not merely compensation. In making

an award of punitive damages, the fact finder should determine that the award is needed to deter such behavior toward the class of which plaintiff is a member, or that the defendant's behavior is so egregious that it warrants public condemnation and punishment. See *Clifton* v. *Massachusetts Bay Transp. Auth., supra* at 624; *Ciccarelli* v. *School Dep't of Lowell, supra* at 795-799.

In determining whether the defendant's conduct was so outrageous or egregious that punitive damages under G. L. c. 151B are warranted, the fact finder should consider all of the factors surrounding the wrongful conduct. Such factors may include:

1. whether there was a conscious or purposeful effort to demean or diminish the class of which the plaintiff is a part (or the plaintiff because he or she is a member of the class);

2. whether the defendant was aware that the discriminatory conduct would likely cause serious harm, or recklessly disregarded the likelihood that serious harm would arise;

3. the actual harm to the plaintiff;

4. the defendant's conduct after learning that the initial conduct would likely cause harm;

5. the duration of the wrongful conduct and any concealment of that conduct by the defendant.

Judges can look to these factors for guidance, and should tailor jury instructions in a particular case by selecting from among the suggested factors as warranted by the evidence.

5. *Errors in trial proceedings.* Wal-Mart claims also that the judge erred in admitting certain evidence; failed adequately to remedy two improper statements in the plaintiff's closing argument; gave two jury instructions that were not warranted by the evidence; and misstated the standard of proof in one of the instructions.[25]

a. *Admission of evidence.* Wal-Mart maintains that the judge erred by admitting, over objection, evidence of the plaintiff's reports of drug losses to Wal-Mart management and to State authorities. Wal-Mart contends that this evidence was relevant

---

[25]One of the claimed errors was the judge's decision to give an instruction on punitive damages in the absence of sufficient evidence to support such an instruction. As discussed *supra*, that instruction was properly given and there was no error. The second asserted error concerned the mixed motive instruction. See note 26, *infra*, and accompanying discussion.

only to the retaliation and whistleblower claims that were dismissed on summary judgment. There was no abuse of discretion. See *Gath* v. *M/A-COM, Inc.*, 440 Mass. 482, 488 (2003) (judge has "broad discretion to make evidentiary rulings, including the power to exclude evidence that would unfairly prejudice an opposing party"). The evidence was relevant to a determination of pretext.

b. *Closing argument.* Wal-Mart argues that a statement in the plaintiff's closing argument was improper, and that the judge did not take adequate curative action. The objectionable statement referred to the retaliation claim, a claim dismissed on summary judgment. Wal-Mart's objection to this statement was sustained. The statement should not have been made, and it was not struck; we must determine whether Wal-Mart was prejudiced by it. See *Gath* v. *M/A-COM, Inc.*, *supra* at 492-495. This one statement was not likely to have altered the outcome of the case. Moreover, the jury heard the judge sustain the objection and thus knew that the remark was improper. Although no additional corrective instructions were requested at trial, Wal-Mart argues further that the judge should have taken more forceful curative action. While it might have been advisable for the judge expressly to instruct the jury to ignore the statement, Wal-Mart did not consider the remark sufficiently harmful to request such an instruction.

c. *Instruction on mixed motive.* Wal-Mart contends, relying on *Wynn & Wynn, P.C.* v. *Massachusetts Comm'n Against Discrimination*, 431 Mass. 655, 666-667, 670 (2000) (*Wynn*), that the mixed motive instruction should not have been given because there was only circumstantial evidence from which the jury could draw an inference of discrimination, and that a mixed motive instruction is appropriate only where there is direct evidence that discrimination has occurred. Wal-Mart states also that, even if such an instruction were appropriate, the judge erred in defining the burden of proof.[26]

Mixed motive cases are those in which the "employer con-

---

[26]Wal-Mart objected to the mixed motive instruction on the ground that there was insufficient evidence to support the instruction; moreover, during the charge conference, Wal-Mart described more explicitly its concern that a proposed instruction improperly shifted the burden of proof to the defendant. After hearing the parties' objections to the jury instructions, the judge stated that all objections made that day were preserved. We therefore treat Wal-Mart's objection as properly before us.

siders both [illegitimate] and legitimate factors at the time of making a decision," but the plaintiff presents strong evidence "that [the] decision was 'because of' " the illegitimate reason. *Price Waterhouse* v. *Hopkins,* 490 U.S. 228, 241-242 (1989). See *Wynn, supra* at 666. In a standard pretext claim using the three-stage *McDonnell Douglas* analysis, the defendant has only a burden of production to articulate, with some support, a lawful reason for its job action; the burden of persuasion remains at all times with the plaintiff. See *Knight* v. *Avon Prods., Inc.,* 438 Mass. 413, 422 (2003); *Abramian* v. *President & Fellows of Harvard College,* 432 Mass, 107, 116-118 (2000). By contrast, in a mixed motive case, the defendant bears the burden of persuasion that it would have taken the same action absent the unlawful motive. Under a mixed motive analysis, where the plaintiff first proves that a proscribed factor played a motivating part in the challenged employment decision, "an employer may not prevail [merely] by showing . . . a legitimate reason for its decision; the employer 'instead must show that its legitimate reason, standing alone, would have induced it to make the same decision.' " *Wynn, supra* at 666, quoting *Johansen* v. *NCR Comten, Inc.,* 30 Mass. App. Ct. 294, 301 (1991).[27]

As stated, Wal-Mart contends that the mixed motive instruction should not have been given because there was no "direct"

[27]When we decided *Wynn & Wynn, P.C.* v. *Massachusetts Comm'n Against Discrimination,* 431 Mass. 655 (2000), we followed Federal law on the subject of mixed motive. Experience with the mixed motive analysis in the Federal courts generated considerable controversy and criticism and resulted in splits in the United States Courts of Appeals. See, e.g., *Desert Palace, Inc.* v. *Costa,* 539 U.S. 90, 94, 99-102 (2003); *Febres* v. *Challenger Carribean Corp.,* 214 F.3d 57, 60-64 (1st Cir. 2000); *Watson* v. *Southeastern Pa. Transp. Auth.,* 207 F.3d 207, 214-222 (3d Cir. 2000), cert. denied, 531 U.S. 1147 (2001). See also *Fogg* v. *Gonzales,* 492 F.3d 447, 453-454 (D.C. Cir. 2007); *id.* at 456-457 (Henderson, J., concurring); *Rachid* v. *Jack in the Box, Inc.,* 376 F.3d 305, 310-313 (5th Cir. 2004); *Wells* v. *Colorado Dep't of Transp.,* 325 F.3d 1205, 1225-1226 (10th Cir. 2003) (Hartz, J., concurring). Many of these courts have criticized the mixed motive analysis. In *Gross* v. *FBL Fin. Servs., Inc.,* 129 S. Ct. 2343, 2346, 2348-2352 (2009), citing ongoing difficulties in applying the mixed motive analysis in any context, and the absence of a mixed motive requirement in the Federal statute on age discrimination in employment, the United States Supreme Court determined that a mixed motive analysis is not permitted in age discrimination cases. We do not consider today whether we will retain a mixed motive analysis under Massachusetts law.

evidence of discrimination, and therefore the evidence was insufficient to entitle the plaintiff to such an instruction. In the context of a discrimination claim, direct evidence "is evidence that, 'if believed, results in an inescapable, or at least highly probable, inference that a forbidden bias was present in the workplace.' " *Wynn, supra* at 667, quoting *Johansen* v. *NCR Comten, Inc., supra* at 300. A mixed motive analysis is appropriate where a "plaintiff can demonstrate with a high degree of assurance" that the employer's action was based on an illegitimate motive but the defendant posits a legitimate motive as well; a plaintiff can meet this burden by either "direct or strong" evidence. *Wynn, supra* at 666-667.

Here, the plaintiff introduced sufficient evidence to justify a mixed motive instruction. There was evidence that Wal-Mart paid the plaintiff substantially less than less-experienced male pharmacists, refused to pay the plaintiff the pharmacy manager salary differential that it paid to male pharmacists, and terminated the plaintiff purportedly for a single policy violation but did not terminate male pharmacists for that or for more serious infractions involving violations of State and Federal law.

Wal-Mart was correct, however, that the mixed motive instruction given was erroneous because the judge did not make clear what the plaintiff's burden was before the burden shifted to the defendant. The judge said incorrectly, "Although the [p]laintiff generally has the burden of proof, in this instance, the [d]efendant must prove by a preponderance of the evidence that it [would have] made the same decision regardless of the [p]laintiff's gender." It is clear that the judge was attempting to follow the framework that we set forth in the *Wynn* case. However, he omitted the important point that first the plaintiff must present a convincing case that there is an illegitimate motive present.

In context, however, the error was harmless. The omission took place at the end of the judge's lengthy instructions on pretext. Earlier in his charge, the judge had repeatedly instructed that the burden remained on the plaintiff to establish that the defendant "terminated her employment and paid her unequally, not for any legitimate business reason, but because of the [p]laintiff's gender." The fact that the judge had emphasized the plaintiff's burden throughout the charge rendered his erroneous instruction regarding the plaintiff's burden on mixed motive unlikely to have

confused the jury as to the burden of proof for establishing discriminatory animus.

6. *Conclusion.* The judge's order granting judgment notwithstanding the verdict as to the punitive damages award is reversed. In all other respects, the judgment is affirmed, and the jury's verdict awarding damages to the plaintiff is reinstated.

*So ordered.*