NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1170                                    Appeals Court

JEROME WODINSKY & another[1] vs. MICHAEL L. KETTENBACH[2] &
                          others.[3]


No. 13-P-1170.

Suffolk.     September 29, 2014. - January 6, 2015.

Present:  Cohen, Meade, & Milkey, JJ.


Consumer Protection Act, Trade or commerce.  Massachusetts Civil
     Rights Act.  Civil Rights, Coercion.  Abuse of Process.
     Conspiracy.  Condominiums, Common expenses.  Real Property,
     Condominium.  Evidence, Relevancy and materiality.
     Practice, Civil, Judgment notwithstanding verdict,
     Attorney's fees.


     Civil actions commenced in the Superior Court Department on
September 28, 2009, and November 13, 2009.

     After consolidation, the case was tried before Frank M.
Gaziano, J., and motions for judgment notwithstanding the
verdict and for attorney's fees were heard by him.


_____

     [1] Bernadette L. Wodinsky.

     [2] Individually and as trustee of 303 Commonwealth
Condominium Trust.

     [3] Frances Demoulas Kettenbach, individually and as manager
of CMTF, LP; and Gary C. Crossen, individually and as trustee of
303 Commonwealth Avenue Realty Trust.

Donald N. Sweeney (Steven P. Perlmutter with him) for the plaintiffs.

Alan K. Posner (Mikalen E. Howe with him) for the defendants.

MEADE, J.  Following the consolidation of two cases for a jury trial, Jerome Wodinsky and Bernadette L. Wodinsky appeal from the allowance by the trial judge of a motion for judgment notwithstanding the verdict (n.o.v.), which vacated in part a $1.85 million award[4] against the defendants, Michael L. Kettenbach, individually and as trustee of 303 Commonwealth Condominium Trust; Frances Demoulas Kettenbach, individually and as manager of CMTF, LP (CMTF); and Gary Crossen, individually and as trustee of 303 Commonwealth Avenue Realty Trust.[5]  The Wodinskys also appeal from the judge's refusal to send to the jury their G. L. c. 93A claims against each of the three individual defendants, and the judge's decision to reduce the attorney's fees award to one of their attorneys.  Crossen and the Kettenbachs cross appeal, claiming that the judge erred in denying their motion for judgment n.o.v. on the Wodinskys' abuse of process, civil conspiracy, and Massachusetts Civil Rights Act

---

[4] The $1.85 million award consisted of:  (1) $175,000 to each plaintiff on counts 1, 2, and 8 (violation of the Massachusetts Civil Rights Act, violation of G. L. c. 183A, § 11(e), and civil conspiracy), (2) $50,000 to each plaintiff on count 7 (abuse of process), and $700,000 to each plaintiff against Frances in her capacity as manager and general partner of CMTF on count 11 (violation of G. L. c. 93A).

[5] We use the parties' first names to avoid confusion.

(MCRA) claims, in making certain evidentiary rulings, and in awarding attorney's fees to the Wodinskys.[6]  Finally, the Kettenbachs, as trustees of the 303 Commonwealth Condominium Trust, appeal the verdict in the second action in the Wodinskys' favor, claiming that they should not have been permitted to challenge the assessment of condominium expenses against them.[7]  We affirm.

Background.  Mindful of the jury's verdicts, we summarize relevant facts in the light most favorable to the Wodinskys, reserving certain details for our later discussion.  See Foley v. Polaroid Corp., 400 Mass. 82, 85 (1987).  At the time of trial, the Wodinskys and the Kettenbachs were owners of condominium units at 303 Commonwealth Avenue, Boston (303 Commonwealth or the building).[8]  In 1977, the Wodinskys purchased unit 3, which is located on the building's fourth floor.  The

---

[6] The Wodinskys also challenge the judge's exclusion of evidence related to Crossen's disbarment as an attorney in the Commonwealth.  See Matter of Crossen, 450 Mass. 533 (2008). Because we do not order a new trial, we need not decide this claim.

[7] Consolidated with this appeal is the Wodinskys' appeal of two single justice orders regarding the page limit allowed for their reply brief.  As the single justice ruled in accordance with Mass.R.A.P. 16(c), (h), and (i), as amended, 428 Mass. 1603 (1999), there was no abuse of discretion.

[8] The building at 303 Commonwealth Avenue is located in the Back Bay section of Boston, and was designed by prominent architects McKim, Mead & White.  Built in 1895, it is unquestionably an historic and elegant property.

Kettenbachs purchased unit 1 in June, 1996, and subsequently transferred title to CMTF, a limited partnership wholly controlled by the Kettenbachs.[9]

The Kettenbachs evidently desired to acquire all five units in the building for the purpose of merging them and transforming the building into a single-family residence for themselves. In 2007, the Kettenbachs (through CMTF) purchased unit 5. They then acquired unit 2 in 2008, when the estate of the deceased owner sold it to Crossen as trustee of 303 Commonwealth Avenue Realty Trust.[10] Following their acquisition of unit 2, the Kettenbachs physically merged units 1 and 2 into a single unit. Later, and as discussed below, the Kettenbachs acquired unit 4. Thus, by the time of trial, the Kettenbachs owned four of the

---

[9] Frances was CMTF's sole general partner, while she and Michael L. were limited partners. CMTF held title to units 1 and 5, while units 2 and 4 were held by the 303 Commonwealth Avenue Realty Trust, with Crossen as trustee.

[10] The Wodinskys alleged that Crossen took several actions that, if true, would violate the Supreme Judicial Court's order of disbarment. See Matter of Crossen, 450 Mass. at 536. Crossen was ordered disbarred as an attorney on February 2, 2008, for conduct that "struck at the heart of the lawyer's professional obligations of good faith and honesty." Ibid. The March 6, 2008, judgment of disbarment required that Crossen resign "all appointments as . . . trustee, attorney-in-fact, or other fiduciary" responsibilities by March 20, 2008. Nevertheless, on February 21, 2008, Crossen took title to unit 2 of the building as trustee of 303 Commonwealth Avenue Realty Trust, a position from which he failed to resign by March 20, 2008. In addition, in June, 2009, Crossen apparently negotiated the purchase of unit 4 on behalf of the Kettenbachs, even drafting the purchase and sale agreement, which he sent to counsel for the seller.

five units at 303 Commonwealth, with the Wodinskys owning the sole remaining unit, unit 3.

A.  Improvements to the building.  In the years preceding this litigation, the Kettenbachs proposed extensive improvements (the Kettenbachs identified them as "repairs") to the building that the Wodinskys claimed were unwarranted.[11]  Under the condominium documents, the Wodinskys were responsible for twenty percent of all validly assessed expenses.[12]  All repairs or improvements were required to be approved by the board of trustees of the 303 Commonwealth Condominium Trust (board), the governing body of the building.  Both Jerome and Michael L. were at all relevant times duly elected members of the board, each entitled to one vote.

Citing leaks in the roof and other issues, the Kettenbachs insisted that a full replacement of the roof and the skylights was needed.  However, Jerome maintained that repairs short of replacement would suffice and would be far less expensive to the unit owners.  Nevertheless, in November, 2008, the Kettenbachs engaged a contractor to replace the roof and the skylights.

---

[11] We discuss only the roof and skylights replacement and the elevator replacement projects.  There were also disputes about the replacement of the building's heating and ventilation system and the renovation of the basement storage area.

[12] Elizabeth Kipp, the owner of unit 4 until selling it to the Kettenbachs, was responsible for ten percent of the total expenses.  The Kettenbachs were responsible for the remainder.

Michael L. signed the contract in his individual capacity, not as an authorized representative of the board.[13]

On March 26, 2009, some four months after signing the roof and skylights contract, the Kettenbachs arranged a board meeting, at which they essentially sought retroactive approval of the contract. Michael L. did not attend.[14] Instead, Crossen appeared as the "representative" of not only Michael L., but of his two adult sons, Michael D. Kettenbach and Edward Kettenbach, who both recently had been elected trustees, but who had not properly accepted or recorded their appointments as required by the trust documents.[15] Both Jerome and Elizabeth Kipp, the owner of unit 4 and a trustee of the board, voted against the improvements. Crossen claimed to hold proxies for Michael D.

---

[13] The contract states that it is between "Mr. and Mrs. Michael Kettenbach" and Performance Building Company, Inc., P.C., and is signed by Michael L. without notation that he is signing in a representative capacity. No mention is made of the board anywhere within the four corners of the contract.

[14] Crossen testified both that Michael L. was present, and that he was not sure if Michael L. was present. However, the jury were entitled to find that Michael L. did not attend. Crossen, Jerome, and Kipp all attended the meeting, as did Attorney Richard Wise, who represented both Jerome and Kipp.

[15] The Wodinskys charge that Michael D.'s and Edward's failures to record their appointments renders their election ineffective. However, the question is ultimately of no import: even if Michael D. and Edward were entitled to vote at the meeting, they did not attend nor did they issue proxies.

and Edward, but the jury found that no proxies had been issued.[16] Thus, of the three votes which Crossen claims to have submitted at that meeting (Michael L. and each of his two sons), none was effective.[17]   Therefore, the Kettenbachs lost the vote.

One month after the March, 2009, meeting, Crossen (on behalf of the Kettenbachs) demanded payment of $31,487.57 from the Wodinskys,[18] which represented the Wodinskys' twenty-percent share of the roof and skylights contract.[19]   Crossen also demanded that the Wodinskys furnish the name and the address of their mortgagee.  After receiving a similar demand for her ten-percent share of the expenses, Kipp sold unit 4 to the Kettenbachs through 303 Commonwealth Avenue Realty Trust (with Crossen as trustee) in July, 2009.  In return, the Kettenbachs forgave Kipp's share of the condominium assessment.  Kipp testified that she felt "forced out" to the extent that she would not be able to afford the cost of work being done, and

---

[16] The Kettenbachs do not challenge this finding.

[17] At most, Crossen validly voted once on behalf of Michael L.

[18] In subsequent correspondence, Crossen noted that "the democratic process" governed the board's actions and that Jerome's "point of view did not carry the day."

[19] Kipp was charged ten percent, or $15,743.78, proportional to her interest in the building.  Crossen demanded checks be forwarded to him, rather than to the building's management company, which had handled prior assessments and maintained records.

that she could not afford the legal fees she believed necessary to "fight about it forever."

The Wodinskys objected to paying any of the Kettenbachs' demands, believing the board never had voted to authorize such expenses. In a letter dated August 6, 2009, an attorney claiming to act for the board demanded from the Wodinskys payment of $31,487.57 within thirty days, which the Wodinskys tendered on September 9 "under protest." However, even though this check was for the full amount requested, the board's counsel refused to accept the check as satisfaction of the alleged debt, and instead added new demands for attorney's fees and costs totaling $2,472.16 for what was at most a four-day delay. The Wodinskys stopped payment on the check. A copy of counsel's demand letter was conspicuously posted on the building's front entrance, which the Wodinskys claim caused them to feel threatened and humiliated. In September, 2009, the Kettenbachs commenced an action in the name of the board to recover the expenses, late fees, attorney's fees, and costs, and to place a lien on the Wodinskys' unit for nonpayment of condominium expenses.[20]

---

[20] The lien was not recorded within the statutory thirty-day period, see G. L. c. 254, § 5, and this count was ordered dismissed on summary judgment. The Kettenbachs do not appeal that order.

B.  The elevator.  On May 11, 2009, as the parties were fully embroiled in their dispute over the roof and skylights work, a Department of Public Safety (DPS) elevator inspector cited twelve issues with the single elevator in 303 Commonwealth.  The Wodinskys, who lived on the fourth floor of the building, relied on and daily used the elevator to reach their unit from the street.  After inspecting the elevator, the DPS inspector issued a repair ticket, which directed that the issues be corrected within thirty days or the elevator would be shut down.  However, even before the inspection took place, the Kettenbachs had been planning for a full replacement of the entire elevator system.  Indeed, there was evidence in the record that the Kettenbachs had arranged the inspection in the hopes that it would result in DPS condemning the elevator, thus justifying replacement.

On hearing of the elevator replacement plan, the Wodinskys received advice from the building's regular elevator maintenance company that the cited problems could be corrected at a fraction of the cost of replacing the entire elevator system.  At worst, the company stated that the system could be fully replaced for approximately $145,500.  When presented with this proposal by June 5, 2009, the Kettenbachs rejected it, and, without board approval, hired another company to perform the replacement

project for $273,200.[21]  Shortly thereafter, the Kettenbachs

caused a sign to be placed on the elevator door, stating that it

had been "condemned" by the DPS, which was not true.  On or

about June 15, 2009, Delta Beckwith (Delta), the Kettenbachs'

hired contractor, shut down the elevator.  However, Delta did

not remove the elevator until mid-July.

The new elevator did not become operable until April 30,

2010, ten months after being shut down.  This date also happened

to be the last day for Michael L., individually, to avoid a

$1,000 per day fine pursuant to a preliminary injunction

(discussed below).  During the period when the elevator was

inoperable, the Wodinskys were denied their sole practical means

of reaching their fourth-floor unit.  Instead, they were forced

to walk up and down the stairs each time they wanted to leave or

to return to their home.  As to Jerome, who at the time of trial

was eighty-four years of age, and Bernadette, who was sixty-

eight years of age, the record amply illustrated the extreme

physical and emotional burden on both of them as they struggled

to ascend or to descend the eighty-six steps that separated

their unit from the street.  Indeed, Jerome suffered from

---

[21] The Kettenbachs asserted that the decision to replace the
elevator had been taken pursuant to a valid meeting and vote of
the board, but testimony varied significantly on that point and
no written records were presented to show that there ever was a
vote or a meeting.  The jury reasonably could have found that
there had not been either.

numerous medical conditions, including diabetes, chronic obstructive pulmonary disease, and emphysema.  Jerome's eighty-six year old brother, who required a walker to move about, was completely unable to navigate the stairs, and died in December, 2009, confined to the Wodinskys' unit.

On June 26, eleven days after the vendor shut down the elevator, Michael L. sent an electronic mail message (e-mail) to Jerome (which he copied to Crossen) demanding prompt payment of $142,001.68 to him, representing twenty percent of the cost of the improvements that had been done at 303 Commonwealth.  That sum included an initial deposit on the elevator project,[22] and did not include the still outstanding $31,487.57 assessment for the roof and skylights work.

In a letter dated October 6, 2009, the Kettenbachs (through Crossen) informed the Wodinskys of their intent to hold a board meeting to discuss (among other topics) the elevator project, the heating system, and the costs of the litigation recently commenced against the Wodinskys.  Inferring that the Kettenbachs would add new charges for the board's litigation against them,

---

[22] The Wodinskys claim in their brief that this fee included twenty percent of the full elevator contract price.  However, the record shows that this demand by Michael L. represented twenty percent of only the $23,700 deposit due.  It is a reasonable inference, however, that, had the injunction not issued, the Kettenbachs would have sought a twenty-percent share of the balance of the elevator contract shortly after it was paid.

the Wodinskys commenced the second of the two cases in the Superior Court.  In this suit, the Wodinskys sought nine counts of relief, including, inter alia:  violation of the MCRA, G. L. c. 12, § 11I; unreasonable interference with the Wodinskys' use of their unit and condominium common areas, G. L. c. 183A, § 11(e); intentional infliction of emotional distress; abuse of process; and civil conspiracy.

Together with their complaint, the Wodinskys moved for a preliminary injunction to end further collection proceedings against them for claimed expenses.  After a hearing on December 23, 2009, a Superior Court judge (not the trial judge), issued the preliminary injunction barring the Kettenbachs from placing a lien on unit 3 or from seeking payment of further common or special assessments during the pendency of the action.  The injunction also imposed a $1,000 per day fine on Michael L. for each day the elevator remained inoperable after April 30, 2010.  This judge also consolidated the board's action and the Wodinskys' action.

After lengthy discovery, innumerable motions between the parties, and nineteen days of trial, the jury returned a verdict for the Wodinskys in the board action.  The jury also returned a verdict for the Wodinskys on most of the claims in their suit.  After trial, the trial judge granted Crossen's and the

Kettenbachs' motion for judgment n.o.v. on the Wodinskys' G. L. c. 93A claim.

Discussion. A. Judgment n.o.v. The Wodinskys appeal the entry of judgment n.o.v. on their G. L. c. 93A claims against CMTF while Crossen and the Kettenbachs appeal the denial of judgment n.o.v. as to the Wodinskys' MCRA, civil conspiracy, and abuse of process claims. A motion for judgment n.o.v. presents a "pure question of law, specifically, whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.'" Quinn v. Mar-Lees Seafood, LLC, 69 Mass. App. Ct. 688, 702 (2007), quoting from Poirier v. Plymouth, 374 Mass. 206, 212 (1978). "The evidence is reviewed in the light most favorable to the plaintiff, 'without weighing the credibility of the witnesses or otherwise considering the weight of the evidence.'" Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 94 n.5 (2009), quoting from Bavuso v. Caterpillar Indus., 408 Mass. 694, 695 n.1 (1990). "That the inferences be reasonable requires that they be based on 'probabilities rather than possibilities' and not the result of 'mere speculation and conjecture.'" Poirier v. Plymouth, supra, quoting from Alholm v. Wareham, 371 Mass. 621, 627 (1976).

1. Chapter 93A claims. After trial, the judge allowed Crossen's and the Kettenbachs' motion for judgment n.o.v. on the

Wodinskys' G. L. c. 93A claim against CMTF.  The motion was allowed not because of the absence of proof of unfair or deceptive acts or practices, but because the complained of acts did not occur within trade or commerce.  The Wodinskys claim this was error, and that the judge should have permitted the jury to decide the c. 93A claim against each individual defendant.  We disagree.

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  G. L. c. 93A, § 2(a), inserted by St. 1967, c. 813, § 1.  The "basic policy [of c. 93A] is to ensure an equitable relationship between consumers and persons engaged in business."  Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 624 (1978).  However, "[t]ransactions that are 'principally private in nature . . . do not fall within the purview of G. L. c. 93A.'"  Office One, Inc. v. Lopez, 437 Mass. 113, 125 (2002), quoting from Zimmerman v. Bogoff, 402 Mass. 650, 662 (1988).  See Lantner v. Carson, 374 Mass. 606, 607-608 (1978).  Moreover, the misconduct must "have an entrepreneurial, commercial or business purpose [that serves] the actor's financial benefit or gain."  McGonagle v. Home Depot U.S.A., Inc., 75 Mass. App. Ct. 593, 599-600 (2009), citing Darviris v. Petros, 442 Mass. 274, 278-281 (2004).

Here, the Wodinskys claim that because CMTF is a business entity, and because the actions of its principals (the

Kettenbachs) at 303 Commonwealth were within the scope of CMTF's stated business purpose, CMTF therefore must have acted in trade or commerce.[23] While this may be true, the record fails to show that the Kettenbachs' actions were motivated by business, rather than personal, reasons.[24] Lantner v. Carson, supra at 608. See Billings v. Wilson, 397 Mass. 614, 616 (1986) (reviewing court "should examine whether the transaction is motivated by business or personal reasons").

The Wodinskys introduced no evidence from which the jury reasonably could have inferred a commercial purpose from the Kettenbachs' actions.[25] In fact, the Wodinskys sought to prove that the Kettenbachs acted in their own personal interest. According to the Wodinskys, the Kettenbachs selfishly desired to acquire all five units at 303 Commonwealth and turn the building into a private residence for themselves. As such, the

---

[23] According to its forming documents as duly filed with the Secretary of the Commonwealth, CMTF's business purpose is to "develop, own, construct, operate, finance and manage real property." Holding title to real estate and completing repair or improvement projects at 303 Commonwealth appear to be within the scope of CMTF's purpose.

[24] We assume, as the jury found, that the actions of CMTF and the Kettenbachs were unfair or deceptive, and focus exclusively on whether the actions were in trade or commerce.

[25] The Wodinskys assert that a transaction may have more than one purpose, suggesting that both a personal and a commercial purpose may have existed here. However, there was no evidence from which the jury could have found a commercial purpose.

Kettenbachs' actions here sprang from disagreements among neighbors about their units in a single condominium building. See Office One, Inc. v. Lopez, supra (no business context to private dispute between trustees and owners of condominium complex). Additionally, there was no evidence that the Kettenbachs planned to sell or to rent any of the units in question. Therefore, even though purchasing and holding title to condominium units was within the scope of CMTF's business purpose, there was no commercial character to the transactions here. See McGonagle v. Home Depot U.S.A., Inc., supra. See also Billings v. Wilson, supra (where landlord's motivation was primarily personal, dealings with tenant not subject to c. 93A).

In light of the evidence presented at trial, the judge properly determined that CMTF's actions had not been conducted in the course of trade or commerce, reasoning that the transactions at issue were "primarily private in nature" and no financial motive underpinned CMTF's activities. Because the actions against the Wodinskys did not take place in a business context, the jury reasonably could not have found that CMTF acted in trade or commerce. See Begelfer v. Najarian, 381 Mass. 177, 190-191 (1980); McGonagle v. Home Depot U.S.A., Inc.,

supra.  As such, Crossen's and the Kettenbachs' motion for judgment n.o.v. properly was granted.[26]

2.  MCRA claim.  Crossen and the Kettenbachs appeal from the denial of their motion for judgment n.o.v. on the Wodinskys' claim under the MCRA.  Crossen and the Kettenbachs claim that there was no credible evidence from which the jury could have found coercive, intimidating, or threatening conduct against the Wodinskys.  We disagree.

To find a violation under the MCRA, plaintiffs "must prove that (1) [their] exercise of enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion."  Buster v. George W. Moore, Inc., 438 Mass. 635, 644 (2003) (citation omitted).  "Whether conduct constitutes coercion is examined from an objective, reasonable person standard."  Currier v. National Bd. of Med. Examrs., 462 Mass. 1, 13 (2012).

The record contains ample evidence from which the jury could have reasonably concluded that Crossen and the Kettenbachs

---

[26] The private nature of the transactions here is even more apparent as against the individual defendants.  For substantially the same reasons as discussed supra, we conclude that Crossen and the Kettenbachs were not acting in trade or commerce when they dealt with the Wodinskys.  Thus, the judge properly refused to submit those claims to the jury.  See Lantner v. Carson, supra.

coerced, intimidated, and threatened the Wodinskys in an effort to force them out of their home.  This evidence, much of which Crossen and the Kettenbachs overlooked in their brief, includes: the Kettenbachs' active attempts to condemn and decommission the building's only elevator; the excessive period of time during which the elevator was unusable, which forced the elderly Wodinskys to walk up and down four flights of stairs; Crossen and the Kettenbachs' manipulation of the board's voting process to the Wodinskys' detriment; the Kettenbachs' demand that the Wodinskys pay twenty percent of expensive, unneeded projects that were not lawfully voted upon by the board; the Kettenbachs' instituting litigation against the Wodinskys to collect such payments while simultaneously forgiving the assessments of another owner who agreed to sell her unit; and the Kettenbachs' hiring of a private investigator to visit Bernadette at her work place for the specific purpose of threatening the Wodinskys with

bankruptcy.[27]  The motion for judgment n.o.v. properly was denied on this count.[28]

3.  Abuse of process.  The Kettenbachs also claim that there was insufficient evidence to support the jury's verdict that they committed abuse of process by instituting the board action against the Wodinskys.  We disagree.

To establish abuse of process, a plaintiff must prove "that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed." Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 775-776 (1986), quoting from Beecy v. Pucciarelli, 387 Mass. 589, 595 (1982).  "The essential elements of the tort are:  (1)

---

[27] The fact that the jury rejected the Wodinskys' intentional infliction of emotional distress claim is not inconsistent with their verdict on the MCRA claim.  As the trial judge properly noted, "Simply because the jury rejected the [Wodinskys'] claim of intentional infliction of emotional distress does not mean that the jury also rejected evidence that they suffered emotional or psychological harm."  Proof of extreme and outrageous conduct is not required to find a violation of the MCRA.

[28] There was also no error in the jury's award of damages even though physical harm was not proven.  As the judge correctly noted, the jury were entitled to award compensatory damages for pain and suffering and emotional distress.  See Agoos Leather Cos. v. American & Foreign Ins. Co., 342 Mass. 603, 608 (1961) ("The amount of damages seldom can be proved with the exactness of mathematical demonstration," [citation omitted]).  The Wodinskys adequately proved at trial such pain, suffering, and emotional distress.

process was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage." Id. at 775-776 (citation omitted).

As the trial judge properly determined, evidence was presented from which the jury could have found that the litigation instituted by the Kettenbachs to collect $31,487.57 from the Wodinskys was frivolous, and had as its motive the ulterior purpose of forcing the Wodinskys out of their home. The board, in whose name the lawsuit had been filed, never authorized the disputed charges.[29] Even though the mere filing of a groundless claim does not by itself constitute abuse of process, in this case, sufficient evidence existed to show the Kettenbachs' ulterior motives. Indeed, they pursued the board litigation as part of their strategy to coerce the Wodinskys into selling their home. See Cohen v. Hurley, 20 Mass. App. Ct. 439, 442 (1985) (liability will be found where process used as "a form of extortion" [citation omitted]). The motion for judgment n.o.v. properly was denied on this claim as well.

4. Civil conspiracy. Crossen and the Kettenbachs also claim that it was error to deny their motion for judgment n.o.v. on the Wodinskys' civil conspiracy claim. Again, Crossen and

_____

[29] As discussed supra, Crossen lacked valid proxies to vote at the March 26, 2009, meeting, and therefore, the board did not authorize the roof and skylights contract that formed the basis of the Kettenbachs' demands.

the Kettenbachs argue that insufficient evidence existed to support the jury's verdict.  We disagree.

To prove civil conspiracy, a plaintiff must show that two or more defendants acted in concert, and that "there was some 'peculiar power of coercion of the plaintiff possessed by the defendants in combination which any individual standing in a like relation to the plaintiff would not have had.'"  DesLauries v. Shea, 300 Mass. 30, 33 (1938), quoting from Cummings v. Harrington, 278 Mass. 527, 530 (1932).  See Kurker v. Hill, 44 Mass. App. Ct. 184, 188-190 (1998).

In the present case, more than sufficient evidence existed from which the jury could have found that Crossen and the Kettenbachs conspired to force the Wodinskys from their home.  As the judge noted, Crossen acted as the representative of the Kettenbachs throughout the events in question.  He copied Michael L. on virtually all of his e-mails, organized and attended board meetings on Michael L.'s behalf, and acted at his explicit direction when sending letters demanding payment of expenses and inquiring about a possible sale of the Wodinskys' unit.  Frances, though not present at board meetings, nevertheless orchestrated key parts of the elevator project, ensured that the expenses to be charged to the Wodinskys were documented, arranged for a lien to be placed on the Wodinskys' unit, and communicated with the building's management company

throughout the period in question. The pressure brought by Crossen and the Kettenbachs collectively vastly outweighed the pressure any of them individually could have generated on the Wodinskys. See DesLauries v. Shea, supra. The motion for judgment n.o.v. on this claim properly was denied.

B. Condominium expenses. The Kettenbachs claim that the Wodinskys should not have been permitted to contest the assessment of $31,487.57 in condominium expenses as contribution to the roof and skylights replacement contract. See Blood v. Edgar's, Inc., 36 Mass. App. Ct. 402, 405-406 (1994). In Blood, this court held that a condominium unit owner who wishes to contest lawfully assessed common expenses first must pay under protest, "absent a prior judicial determination of illegality." Id. at 405. However, the Wodinskys have not run afoul of Blood.

The Wodinskys forwarded a check for the full amount requested, but counsel (acting in the name of the board) refused to accept that check in satisfaction of the expenses. Instead, counsel stated that the check "fails to include interest, attorney's fees and costs," purportedly to be included because the payment was made after the thirty-day window given by counsel. The Kettenbachs, through counsel, added $2,472.16 in attorney's fees and expenses for what appears to be a late payment of as few as four days.

Furthermore, the Wodinskys did not initially contest the assessment in court. Rather, it was the Kettenbachs who contested it by filing suit in the name of the board to seek collection of the expenses. When the Wodinskys subsequently filed their own action, they sought equitable relief in the form of a preliminary injunction, as expressly permitted by Blood. See id. at 406 ("If appropriate, the unit owner may . . . petition the court for equitable relief"). That injunction barred the Kettenbachs from further pursuing these expenses, thus constituting precisely the type of "prior judicial determination" needed to satisfy Blood. Id. at 405. There was no error.[30]

C. Evidentiary rulings. Crossen and the Kettenbachs claim that the judge erred by allowing the Wodinskys' motion in limine that barred the introduction of evidence relative to the Wodinskys' mortgage or personal finances. We disagree. The judge held that introducing evidence of the Wodinskys' personal finances and debt was irrelevant to the question whether the Kettenbachs sought to force the Wodinskys from their home. We

---

[30] The preliminary injunction was dissolved by the entering of final judgment, which denied the Kettenbachs' claim for condominium expenses. Therefore, any appeal of this question is moot. Judge Rotenberg Educ. Center, Inc. v. Commissioner of the Dept. of Mental Retardation (No. 2), 424 Mass. 471, 472 (1997) ("A preliminary injunction lapses when a final decree is entered").

find no abuse of discretion or legal error in excluding this evidence.  See Zucco v. Kane, 439 Mass. 503, 507 (2003).

D.  Attorney's fees.  The Wodinskys are entitled to attorney's fees as the prevailing plaintiff in a MCRA claim. See G. L. c. 12, § 11I.  Even though the Wodinskys did not prevail on all of their other claims, the trial judge properly found that the claims on which the Wodinskys were not successful were "sufficiently interconnected" with the claims on which they did prevail.  Killeen v. Westban Hotel Venture, LP, 69 Mass. App. Ct. 784, 792 (2007) (citation omitted).  We discern neither error nor an abuse of discretion in the judge's determination. See Batchelder v. Allied Stores Corp., 393 Mass. 819, 822 (1985) ("a party prevails under G. L. c. 12, § 11I[,] when he or she achieves success on a substantial question of law arising out of a common nucleus of facts that gives rise to a cause of action under the statute").

The judge reduced by one-half the fee award of Attorney Donald N. Sweeney, who claimed to have devoted 3,318.75 hours to the case.  As the prevailing plaintiff seeking attorney's fees, the Wodinskys had the burden of proving that the amount of time billed and the nature of the work done both were reasonable. The judge was well within his discretion to conclude that the records submitted by Sweeney were inadequate to allow a proper evaluation of the precise nature of his work.  For example, some

of the submitted records reduce whole days of work into one sentence or less.  The judge, having observed counsel's work and conduct firsthand, was in the best position to evaluate the reasonableness of counsel's fees and time, and we have not been provided with adequate reasons to question on appeal the judge's resolution of the matter.  See Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411, 428 (2005).

As the Wodinskys have prevailed in their MCRA claim on appeal, the provisions of that statute entitle them to appellate attorney's fees as well.  See Yorke Mgmt. v. Castro, 406 Mass. 17, 19 (1989) ("The statutory provisions for a reasonable attorney's fee would ring hollow if it did not necessarily include a fee for the appeal" [citation omitted]).  See also Trustees of Health & Hosps. of Boston, Inc. v. Massachusetts Commn. Against Discrimination, 449 Mass. 675, 688-689 (2007).  Accordingly, the Wodinskys may proceed in conformance with the procedure outlined in Fabre v. Walton, 441 Mass. 9, 10-11 (2004), by providing to this court within fourteen days of the date of the rescript supporting documentation of their appellate attorney's fees.  Crossen and the Kettenbachs will have fourteen days thereafter to respond.  Id. at 11.[31]

Amended judgments entered
December 4, 2012, affirmed.

---

[31] We deny Crossen's and the Kettenbachs' request for appellate attorney's fees.

<u>Single justice orders entered
      March 25, 2014, and
      April 8, 2014, affirmed</u>.